**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KEVIN A. TOLLIVER,**

      **Petitioner,**

                          **CASE NO. 2:05-CV-1161**

**v.**                             **JUDGE SMITH**

                              **MAGISTRATE JUDGE KING**

**MICHAEL SHEETS, Warden,**

      **Respondent.**

**ORDER and
REPORT AND RECOMMENDATION**

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition, respondent's return of writ, and the exhibits of the parties.  For the reasons that follow, petitioner's request to amend the petition is **GRANTED**;  however, petitioner's request for a stay of proceedings is **DENIED.**  The Magistrate Judge **RECOMMENDS** that this action be **DISMISSED** without prejudice as unexhausted.  Alternatively, petitioner may notify the Court within ten (10) days if he wishes to amend the petition to delete his unexhausted claim and proceed on his remaining exhausted claims.

## I.  FACTS AND PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On January 9, 2002, defendant was indicted by a Franklin County Grand Jury on one count of murder with a firearm specification, in violation of R.C. 2903.02 and 2941.145, respectively, and one count of tampering with evidence in violation of R.C. 2921.12. Prior to trial, defendant's motion to suppress statements made by defendant was denied. A jury trial commenced on June 3, 2002. Following opening statements, the court, on motion of defendant, dismissed the tampering with evidence count. The court's oral decision was reaffirmed in a subsequently filed written decision. After a three-week trial, the jury returned a verdict finding defendant guilty of

murder with a firearm specification. The trial court sentenced defendant to 15 years to life on the murder charge, with an additional three years incarceration on the firearm specification. Thereafter, defendant filed a motion for judgment of acquittal or, in the alternative, motion for new trial, to which the state responded. By decision and entry filed August 13, 2002, the trial court denied defendant's motion without a hearing.

Claire Schneider began dating defendant in the fall of 1999. Defendant was divorced from his ex-wife, Natasha Tolliver, with whom he shared custody of their young daughter. Claire, a student at The Ohio State University ("OSU") and a part-time nail technician, moved into Apartment 120 in the Olentangy Village Apartment complex located at 100 North Street, Columbus, Ohio, in January 2001. Defendant began living with Claire in September 2001. Claire and defendant planned to move out of the apartment and into a house, once defendant's extensive remodeling of the house was completed in January 2002. Claire obtained a loan to purchase the house.

Claire had been accepted into OSU's Program in International Development and was scheduled to study in the Dominican Republic from January 5, 2002 to February 16, 2002. Defendant was scheduled to meet Claire in the Dominican Republic at the conclusion of the program and spend a week vacationing with her. Claire told both her father, Walter Schneider, and her friend and co-worker, Gail Isenberg Hayes, that she was excited about the upcoming trip. She never mentioned to either of them that she had any plans to marry defendant.

In August 2001, Claire went to Dr. Stanley McCloy complaining of sleeping difficulty, nightmares, panic attacks and an inability to concentrate. Dr. McCloy diagnosed moderate depression and prescribed Paxil. Pharmacy records indicated that Claire's Paxil prescription was last filled on November 24, 2001.

On December 28, 2001, Claire attended the closing on the house. Problems arose with some of the documentation, so the transaction was not completed.

Around 12:00 a.m. on December 29, 2001, Claire and defendant had drinks at a restaurant with a friend and later went to a nearby nightclub. At one point, Claire's co-worker, Abby Warner, noticed Claire and defendant dancing together; however, Warner later saw Claire dancing without defendant. Warner noticed that defendant was watching Claire as if he were angry.

2

Collin Bumgarner, the manager of the nightclub, saw defendant and Claire leave the nightclub and walk to defendant's vehicle. The couple attracted Bumgarner's attention because they were speaking loudly to one another; however, Bumgarner did not view the incident as alarming.

Defendant and Claire returned to the apartment at approximately 12:36 a.m. Approximately five minutes later, defendant, wearing a light-colored shirt, exited the apartment building and searched the parking lot with a flashlight. He returned to the building approximately four minutes later.

At 1:15 a.m., Janet Parady, who resided in Apartment 220, was awakened to a man screaming "No, No. Don't, don't. Oh, please. Please." (Vol.I, Tr. 76.) She called 911 and reported that she thought the screaming came from Apartment 320, the apartment directly above her. She further reported that the people who lived in apartment 320 had been fighting for approximately one-half hour, and that it sounded like someone had fallen down.

Columbus Police Officer David Shots responded to Parady's 911 call at 1:18 a.m. While he was in Parady's apartment, he heard a noise that sounded like "moaning or crying." (Vol.I, Tr. 139.) He could not determine what the sound was or where it originated, so he conducted no further investigation. Because Parady reported that the earlier disturbance came from Apartment 320, Shots proceeded there. In response to questioning by Shots, the occupants denied that any arguing or fighting had occurred.

At approximately 1:45 a.m., Natasha Tolliver received a telephone call from defendant. Defendant was sobbing and told Natasha that if she ever loved him, she would come to his apartment immediately. Natasha put her daughter in her car and drove to the apartment complex at approximately 1:55 a.m. When she arrived at defendant's apartment, she saw blood smeared on the front door. Defendant was dressed in a blood-stained bathrobe and had blood on his hands and legs. She also noticed blood on the living room wall and kitchen floor. Natasha told defendant she was going to take their daughter back to the car. Defendant followed her outside. When she asked defendant what had happened, he told her that he was "really in trouble." (Vol.XII, Tr. 1727.) Natasha told defendant to call the police. Defendant was crying so hysterically that Natasha thought he was having a breakdown. Defendant said he was going to kill himself

3

and that he wanted to see his daughter. Natasha called 911 and reported what had happened. She then drove to the other side of the parking lot because she was afraid defendant might kill himself in front of their daughter.

Peter Kovarik, the resident of Apartment 215, returned to the apartment complex at approximately 2:00 a.m. As he walked inside the building, he noticed defendant, dressed in a bathrobe, standing in the hallway outside Apartment 117. Defendant seemed startled to see Kovarik and ducked into the alcove outside Apartment 117. Seconds later, defendant stepped out from the alcove and asked Kovarik "how's it going?" (Vol.I, Tr. 107.) In response, Kovarik asked defendant "how is it going with you?" Defendant responded "good." (Vol.I, Tr. 108.) According to Kovarik, defendant did not act as if he were upset about anything and did not ask him for assistance.

Officers Shots and Paul Coulter responded to Natasha's 911 call between 2:00 and 2:05 a.m. Natasha met the officers outside the building and reiterated what she had reported in her 911 call. Thereafter, the officers proceeded to defendant's apartment. Defendant emerged from the apartment, dressed only in a bathrobe. The bathrobe had blood on it, as did defendant's feet and legs. Defendant was talking on a cell phone (later determined to be Claire's) and holding a bloody dishtowel. Defendant told the officers, "[s]he shot herself." (Vol.I, Tr. 149.) According to both Shots and Coulter, the door to Apartment 117 had smeared blood on it, as if someone had tried to wipe blood off the door. There was also blood spatter on the door jamb of Apartment 117. Defendant was immediately handcuffed and placed in Shots' cruiser. Defendant said, "I can't believe she did this. She has only held a gun-she has never even held a gun." (Vol.I, Tr. 152.) Defendant then started to cry and said "her dad is going to be mad at me." *Id.* Defendant also averred that he could not find a telephone. Defendant ultimately fell asleep in the cruiser and was thereafter transported to the police station.

While searching the apartment, Officer Coulter found blood on the walls and floor, as well as on several items in the apartment. An overturned floor lamp and potted plant lay on the living room floor. Coulter discovered Claire's dead body lying face-up on the bathroom floor on top of a black nylon jacket. Her arms were partially inside the sleeves of the jacket, which was saturated with blood. A blood-covered 9mm Ruger semiautomatic pistol, an envelope containing $3, and a handwritten note were found on the vanity in the bathroom. The note said "she did not know gun was loaded. I loved her. Could not

find the phone." (Vol. II, Tr. 308, State's Exhibits D120, D121, E12.) Inside the sink lay two live shells and the gun's magazine clip containing 12 live shells. The gun did not contain a live round in the chamber. The bathroom door contained a single bullet hole that had several strands of hair attached to it. A spent 9mm shell casing was found in the hallway just outside the bathroom. A spent 9mm bullet was found behind the door in the bathroom. Two pens and a semiautomatic weapon magazine clip containing live rounds of ammunition were found underneath Claire's body.

Columbus Police Detective Robert Viduya arrived at the scene after defendant was secured in the cruiser. Viduya instructed the transport officers not to allow defendant to go to the bathroom at the police station, so that blood evidence on defendant's body could be collected. Photographs taken of defendant at the police station show blood on defendant's face, legs and feet; however, no blood appears on defendant's hands.

A videotaped interview of defendant was conducted at the police station. The substance of the interview will be discussed below.

Columbus Police Crime Scene Search Unit Detectives Thomas Seevers and Mark Henson processed the scene on December 29, 30 and 31, 2001. Over the course of three days, 181 photographs were taken and 23 bags of evidence were collected. Seevers noted that that there was no land line telephone in the apartment. No fingerprint lifts were taken from the bullets found in the bathroom, nor was the gun checked for latent fingerprints. No gunshot residue analysis was performed on Claire because gunshot victims are assumed to have residue on them. No gunshot residue analysis was performed on defendant due to defendant's close proximity to Claire at the time of the shooting and because defendant said he had washed his hands. Two cell phones were recovered from defendant's vehicle, which was in the parking lot adjacent to the building. Claire's wallet was recovered from the parking lot.

After the police completed processing the scene, the locks on the apartment were changed. The only persons with keys to the apartment were apartment manager Molly Bringarner and maintenance supervisor Kenneth Smith. On January 7, 2002, two employees of Servpro, a biohazard cleanup company, were permitted entrance to clean the apartment of blood residue. An insurance claims representative was also permitted access to the apartment on January 7, 2002 to assess damage.

On January 9, 2002, Claire's stepmother, Amy Schneider, and Claire's aunt, Teresa Reid, went to the apartment to sort and pack items in preparation for removing them. While sorting through clothes in the master bedroom, Reid discovered a pair of men's black slacks with blood on the inside of one of the pockets lying on the floor, and a man's white dress shirt with blood on it near the bottom of a clothes hamper, underneath some other clothes. Because she assumed the police had retrieved everything they needed from the apartment, Reid placed the items in two separate garbage bags and left them in the apartment. Later that day, Reid informed Claire's father, Walter Schneider, of her discovery. After conferring with the police and one of the prosecutors, Mr. Schneider contacted Reid and asked her to meet him at the apartment the next day. Mr. Schneider retrieved the items from Reid when the two met at the apartment on January 10, 2002. While in the apartment, Mr. Schneider noticed blood on a pair of defendant's black boots; however, he did not retrieve the boots at that time. Mr. Schneider put the slacks and shirt in the back of his vehicle. On January 13, 2002, Mr. Schneider asked his son-in-law to retrieve the boots from the apartment. After the son-in-law retrieved the boots, Mr. Schneider stored the slacks, shirt and boots in the basement of his home. Later that evening, Mr. Schneider contacted the police. Detective Michael Cone retrieved the items from Mr. Schneider's residence and submitted them to the Columbus Police Department ("CPD") property room.

Keith Norton, forensic pathologist and deputy coroner at the Franklin County Coroner's office, performed an autopsy on Claire. During the autopsy, Norton discovered several contusions on Claire's legs and several small abrasions on the right side of her face near her mouth. He also discovered an abrasion and a contusion on the left side of Claire's neck which he estimated to be less than 48-hours old. He further discovered that the right side of Claire's lips were severely burned. There was no damage to Claire's front teeth, but several of the back teeth on the upper right side of Claire's mouth had been fractured. Based on the damage to Claire's teeth and lips, Norton determined that the bullet entered the corner of the right side of Claire's mouth, and that her mouth was open when the bullet entered. Norton could not visualize the entrance wound in the back of the mouth because it was so far back; however, he could see the exit wound in the back of the neck. Norton determined that the trajectory of the bullet was front to back, slightly left to right, and upward.

A toxicology screen of Claire's blood measured 0.16 grams of

6

alcohol; no other drugs were found. Norton concluded that the cause of death was a loose contact wound to the head; however, he could not determine the manner of death, as it was unclear whether it was suicide or homicide. Norton found it unlikely that Claire's death was an accident due to the proximity of the gun to her mouth at the time the gun was discharged. According to Norton, it would have been an unusual form of suicide to have fired a weapon from outside the mouth into the mouth. He conceded, however, that Claire, who was left-handed, could have caused the wound if she held the gun in her left hand. He estimated that after sustaining the gunshot wound, Claire would have become unconscious within seconds and would have died within 30 minutes. He also reported that the autopsy findings were not inconsistent with cardiopulmonary resuscitation ("CPR") having been performed.

Columbus Police Criminalist Amoreena Clarkson performed a blood analysis of several items of evidence. Claire's blood was confirmed to be present on a dishtowel, gloves, paper towel, defendant's bathrobe, defendant's body, the magazine clip, white shirt, black slacks and black boots.

Columbus Police Detective and bloodstain expert Robert Young viewed the crime scene on December 30, 2001. He also reviewed photographs of the crime scene, laboratory reports, police reports, and defendant's statement. Young noted diluted blood droplets in the kitchen, which indicated that some cleanup effort had occurred. He also identified several blood transfer stains on Claire's body which Young opined were made by the repositioning of her body after her death. Young determined that Claire had been shot while standing in the bathroom and that the bullet passed through the bathroom door approximately 62 inches from the floor. He further determined that because the pen used to write the note discovered on the sink was found under Claire's body, defendant repositioned Claire's body on top of the pen after she was shot.

Young also noted 18 impact spatterings on the right forearm of the white shirt found in the clothes hamper. According to Young, the entrance wound in Claire's mouth produced high velocity back spatter, which landed on the right sleeve of the shirt, demonstrating that the shirt was in close proximity to Claire's face at the instant she was shot. Impact droplets in the button line on the front of the shirt indicated that the shirt was worn unbuttoned at the time of the spattering. Young candidly admitted that he did not think the shooting was a homicide until he saw photographs of the shirt. Young

7

conceded that expirated blood from Claire's mouth or nose expelled during CPR might appear as high velocity spatter, but he did not believe that the bloodstains on the shirt were expirated. Young concurred in Norton's opinion that the fact that only Claire's back teeth sustained damage indicated that her mouth was open at the time she was shot. Young agreed that the blood spatterings found on the shirt are consistent with the theory that someone fired the gun with the left hand while holding Claire by the throat with the right hand. Young conceded, however, that the blood spatter evidence did not provide a direct indication of who fired the gun.

Columbus Police Criminalist and ballistics expert Mark Hardy examined both the shell casing and spent bullet found in the bathroom and determined that the bullet had been fired from the 9mm weapon found at the scene. Hardy further determined that the gun was capable of being fired without the magazine clip being inserted.

Hardy further determined that the gun was fired so close to Claire's mouth that the gasses projected out of the muzzle burned Claire's lips. Using a transparent overlay that showed the forward face of the gun, and placing that overlay over a photograph of the burned area on the right side of Claire's mouth, Hardy determined the orientation of the gun when it was fired. An unburned area on the right corner of Claire's mouth showed that the gun had been in contact with her mouth and that the recoil guide of the weapon had protected the corner of her mouth from the hot outgassing that otherwise burned her lips. Hardy determined that the gun was positioned on its side with the butt of the gun facing to the left; in other words, the gun was turned 90 degrees clockwise.

Defense bloodstain expert Stuart James determined that Claire was standing no more than 6 to 12 inches from the bathroom door when she was shot. With regard to the bloodstain spatters on the white shirt, James concluded that it was impossible to state with scientific certainty whether the spatters were produced by gunshot back spatter.

Claire's cell phone records demonstrate that between 1:29 and 2:15 a.m. on December 29, 2001, seven calls were made to Natasha Tolliver's cell phone, one call was made to Claire's cell phone, one call was made to defendant's cell phone, and one call was made to a friend of defendant.

While defendant was awaiting trial, he was confined with an inmate named Joseph Adams. After Adams discovered that defendant had

been charged with murder, he decided to try to coerce defendant into revealing details about the murder so that he could then provide that information to the state in exchange for a reduction in his sentence. After Adams provided the information obtained from defendant, the state agreed to an eight-year reduction in Adams' 16-year sentence in exchange for his testimony. Adams testified that he obtained all the details about the murder from defendant and did not get any details from the prosecutor, the police, or television news.

According to Adams, defendant told him that Claire worked as a nail technician and that she was going to study in the Dominican Republic. Defendant said he did not want Claire to go to the Dominican Republic because he might lose her. He also told Adams that they were preparing to move into a house and that they were planning to get married in the Dominican Republic.

Adams testified that defendant initially told him that Claire was depressed and committed suicide by shooting herself in the chest. He later admitted that a discussion about her finalizing plans for her trip led him to kill her with a 9mm weapon. Defendant initially said that he did not call 911 immediately because he was in shock. However, he later confessed that he did not call 911 because he had to get rid of evidence, move the body to make it look like Claire killed herself, and get blood on himself to make it look like he had held her. Defendant also told Adams that his defense would be that Claire killed herself and he would look remorseful and cry in front of the jury so they would believe him.

An inmate incarcerated with defendant and Adams, David Dye, testified on behalf of defendant. According to Dye, Adams approached him prior to defendant's trial and asked him if he wanted to testify against defendant in order to "help myself (Dye) out." (Vol.XII, Tr. 1670.) Dye told Adams that he could not testify against defendant because he did not know anything about defendant's case. He further stated that although Adams never told him he had made up the story about defendant, Dye got the impression that Adams had done so.

*State v. Tolliver,* 2004 WL 625683 (Ohio App. 10 Dist. March 30, 2004), Exhibit F to Return of

9

Writ. Represented by one of his trial attorneys,[1] petitioner filed a timely appeal. He raised the following assignments of error:

> [I.] THE TRIAL COURT ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENTS DURING HIS CUSTODIAL INTERROGATION WHERE THE STATEMENTS WERE TAKEN IN VIOLATION OF *MIRANDA V. ARIZONA* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

> [II.] THE CONVICTION OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THERE WAS INSUFFICIENT EVIDENCE OF A PURPOSEFUL KILLING.

> [III.] DEFENDANT'S FIFTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE PROSECUTION ARGUED THAT DEFENDANT'S INVOCATION OF HIS RIGHT TO SILENCE INDICATED THAT HE WAS GUILTY. THIS VIOLATED DEFENDANT'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS UNDER THE U.S. CONSTITUTION AND ARTICLE 2, § 2, 10 AND 16 OF THE OHIO CONSTITUTION.

> [IV.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY ALLOWING ADMISSION OF THE WHITE SHIRT WHEN THERE WAS AN INSUFFICIENT CHAIN OF CUSTODY AND THE SHIRT WAS MORE PREJUDICIAL THAN PROBATIVE THEREBY DENYING DEFENDANT HIS RIGHTS TO DUE PROCESS, AND A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS.

> [V.] A DEFENDANT IS DENIED HIS RIGHTS TO A FAIR TRIAL, DUE PROCESS AND A RELIABLE DETERMINATION OF HIS GUILT AND SENTENCE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION WHEN THE PROSECUTOR REPEATEDLY ENGAGES IN IMPROPER ARGUMENT AND OTHER MISCONDUCT.

---

[1] Three attorneys represented petitioner at trial. One of those attorneys, Carol Wright, also represented him on appeal. *See* Exhibits B and C to Return of Writ.

10

[VI.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN REFUSING THE DEFENSE ACCESS TO CLAIRE SCHNEIDER'S DIARY, COURT EXHIBIT 1, PARTICULARLY AFTER THE PROSECUTOR PRESENTED EVIDENCE IN DIRECT CONTRAST TO ENTRIES IN THE DIARY.

[VII.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO GRANT AN EVIDENTIARY HEARING ON THE MOTION FOR NEW TRIAL.

[VIII]. A CONVICTION MUST BE REVERSED WHEN THE CUMULATIVE EFFECT OF ERRORS DEPRIVES A DEFENDANT OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

*Id.* On March 30, 2004, the appellate court affirmed the trial court's judgment. *Id.* Still represented by the same counsel, petitioner filed a timely appeal to the Ohio Supreme Court. He raised the following propositions of law:

1. A defendant's statements in response to express questioning during custodial interrogation must be suppressed when there are no Miranda warnings and no voluntary, knowing and intelligent waiver of the right against self-incrimination as they violate the Fifth and Fourteenth Amendments to the United States Constitution.

2. The use of statements made by a defendant after his request for an attorney violates the Fifth and Fourteenth Amendments to the United States Constitution.

3. Defendant's Fifth Amendment rights were violated when the prosecution argued that defendant's invocation of his right to silence indicated that he was guilty. This violated defendant's rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments under the U.S. Constitution and Article 2, §2, 10 and 16 of the Ohio Constitution. *Doyle v. Ohio* (1976), 426 U.S. 610.

4. Counsel's failure to object to the *Doyle v. Ohio* error was ineffective assistance of counsel and violated appellant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United

11

States Constitution.

5.  Admission of evidence when there is an insufficient chain of custody and the evidence is more prejudicial than probative denies a defendant his rights to due process, and a fair trial under the state and federal constitutions.

6.  A defendant is denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the prosecutor repeatedly engages in improper argument and other misconduct.

7.  A court denies due process, a fair trial and the effective assistance of counsel as guaranteed by the U.S. Constitution when it withholds material information and documents available to the prosecution from the defense.

8.  A conviction must be reversed when the cumulative effect of errors deprives a defendant of his state and federal constitutional right to a fair trial.

Exhibit G to Return of Writ.  On August 4, 2004, the Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal.  Exhibit I to Return of Writ.  Petitioner filed a motion for reconsideration.  On September 29, 2004, the Ohio Supreme Court denied that motion.  Exhibits J and K to Return of Writ.

Meanwhile, on June 9, 2003, petitioner filed a *pro se* petition for post conviction relief with the state trial court.  He asserted the following claims:

1.  Counsels' ineffectiveness in failing to introduce evidence of "Paxil withdrawal syndrome" to show the victim Claire Schneider committed suicide.

2.  Ineffectiveness in failing to have the white shirt tested for gun shot residue.

12

3. Ineffectiveness in failing to have the brown coat tested for gun residue.

4. Ineffectiveness in failing to elicit evidence from Claire's family members regarding Claire's emotional state.

5. Actual innocence.

*See* Exhibits L and N to Return of Writ. On May 7, 2004, the trial court denied the petition. Exhibit

N to Return of Writ. Petitioner filed a timely appeal. He asserted the following claims:

I. THE TRIAL COURT ERRED IN NOT HOLDING AN EVIDENTIARY HEARING PURSUANT TO R.C. 2953.21(E); AND 2953.22.

II. THE TRIAL COURT ERRED IN FINDING THE CLAIMS OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WAS BARRED BY DOCTRINE OF RES JUDICATA. WHEN SUCH EVIDENCE THAT COUNSEL FAILED TO INVESTIGATE DEHOURED THE TRIAL RECORD IN ITS ENTIRETY. [SIC]

*State v. Tolliver*, 2005 WL 534897 (Ohio App. 10 Dist. March 8, 2005), Exhibit R to Return of Writ.

On March 8, 2005, the appellate court affirmed the trial court's dismissal of the petition for post

conviction relief. Petitioner filed a timely appeal to the Ohio Supreme Court in which he raised the

following propositions of law:

1. The trial court erred in not holding an evidentiary hearing pursuant to R.C. 2953.21(E).

2. The trial court erred in finding the claim of ineffective assistance of trial counsel's failure to investigate pre-trial to be barred by *res judicata.*

Exhibit S to Return of Writ. On August 10, 2005, the Ohio Supreme Court declined jurisdiction to

13

hear the case and dismissed the appeal as not involving any substantial constitutional question. Exhibit U to Return of Writ.

Additionally, on December 29, 2004, petitioner filed a delayed application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). Exhibit V to Return of Writ. On May 5, 2005, the appellate court denied petitioner's delayed application as untimely. Exhibit Y to Return of Writ. Petitioner filed a motion for reconsideration, which was denied. Exhibits Z and BB to Return of Writ. Petitioner filed a timely appeal to the Ohio Supreme Court; however, on August 10, 2005, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. Exhibits CC and EE to Return of Writ.

Represented by the Ohio Public Defender, on December 28, 2005, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1. Mr. Tolliver's rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to suppress, and the State presented to the jury, Mr. Tolliver's statements made in response to express questioning that occurred during custodial interrogation conducted without the benefit of Miranda warnings and in the absence of a voluntary, knowing and intelligent waiver of Mr. Tolliver's right against self-incrimination.

> 2. Mr. Tolliver's rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to suppress, and the State presented to the jury, statements Mr. Tolliver made after his request for an attorney.

> 3. Mr. Tolliver's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated when the prosecution argued that Mr. Tolliver's invocation of his right to remain silent indicated that he was guilty.

14

4. Mr. Tolliver's right to the effective assistance of trial counsel was violated when counsel failed to lodge a contemporaneous objection to the State's use of Mr. Tolliver's invocation of his right to remain silent to infer his guilt.

5. Mr. Tolliver was denied his federal constitutional rights to due process and a fair trial when the trial court allowed the admission of physical evidence that was the product of a highly unreliable chain of custody and unduly prejudicial to Mr. Tolliver.

6. Mr. Tolliver was denied his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when the prosecutor repeatedly engaged in improper argument and other misconduct.

7. Mr. Tolliver's rights to due process, a fair trial, and the effective assistance of counsel were denied by the trial court's withholding from the defense material information and documents that were available to the prosecution.

8. The cumulative effect of trial error violated Mr. Tolliver's rights to due process and a fair trial.

9. Mr. Tolliver's trial counsel were constitutionally ineffective in failing to procure and present additional evidence and argument concerning Paxil, Paxil Withdrawal Syndrome, Claire Schneider's medical and psychological history, and the relationship of these matters to Claire Schneider's death.

10. Mr. Tolliver's trial counsel were constitutionally ineffective in failing to have the white shirt and the brown coat tested for gunshot residue.

11. Mr. Tolliver's appellate counsel provided constitutionally ineffective assistance in failing to raise two assignments of error:

1. Counsel provided constitutionally deficient performance and was ineffective in failing to identify the state's witness Joseph Adams as an agent of the state and attacking his questioning of the defendant as reinterrogation or secret interrogation....

2. Counsel provided constitutionally deficient performance and was ineffective in failing to recognize the defendant was not present at a critical stage of the trial proceedings....

15

It is the position of the respondent that claims four through six, and ten and eleven are procedurally defaulted and that the remainder of petitioner's claims are without merit.

## II.  MOTION TO AMEND PETITION AND REQUEST FOR A STAY

On November 6, 2006, petitioner filed a motion to amend the petition to include the following additional claim:

> Mr. Tolliver's rights to a fundamentally fair trial and to present a defense were violated when he was denied the opportunity to present evidence regarding the increased risk of suicidality among young adults (ages 19 to 30 years) who take Paxil and evidence regarding the severe withdrawal symptoms that many people suffer, and that Claire Schneider did suffer, when suddenly discontinuing the use of Paxil.  The trial resulted in the conviction of an innocent man. Therefore, Mr. Tolliver was denied his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Respondent opposes petitioner's request on the basis that petitioner raised this same claim in his petition for post conviction relief, albeit in the context of ineffective assistance of counsel, which claim has already been rejected by the state courts.  Additionally, respondent notes that petitioner purportedly confessed to his cell mate Joseph Adams while awaiting trial.  In his reply in support of his motion to amend, petitioner contends that the factual basis for his claim did not become available until Spring 2006, in view of new reports on the alleged increased suicide risk associated with young adults taking Paxil.  *See Petitioner's Reply, at 2; Exhibits A and B; see also Exhibits attached to Request to Amend and Stay*.  According to petitioner, the interests of justice and *Rhines v. Weber*, 544 U.S. 269 (2005), warrant granting his request for a stay of proceedings pending exhaustion of a motion for a new trial in the state courts.  *See Petitioner's Reply; Request to Amend and Stay*.

## A.  STATUTE OF LIMITATIONS

As a preliminary matter, the Court notes that, although respondent has not raised the issue of whether petitioner's proposed new claim is barred by the one-year statute of limitations, and petitioner contends that his request is timely because it was filed approximately two days before the statute of limitations expired, petitioner's November 6, 2006, request to amend the petition with a new claim may be untimely. A district court is authorized, but not obligated, to *sua sponte* raise this issue. *See Day v. McDonough*, 126 S.Ct. 1675, 1684 (2006).[2]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became effective on April 24, 1996, provides for a one-year statute of limitations on the filing of habeas corpus actions. 28 U.S.C. §2244(d)(1) provides:

> (d)(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. The limitation period shall run from the latest of -
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially

---

[2] In *Day v. McDonough, supra*, 126 S.Ct. at 1684, the Supreme Court also stated:

[B]efore acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions. *See, e.g.*, *Acosta,* 221 F.3d, at 124-125; *McMillan v. Jarvis,* 332 F.3d 244, 250 (C.A.4 2003).

*Id.* The parties may respond to the issue of statute of limitations in any objections to the *Report and Recommendation*.

recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. §2244(d)(1),(2).

Petitioner's conviction became final on December 28, 2004, *i.e.,* ninety days after the Ohio Supreme Court's September 29, 2004, dismissal of his motion for reconsideration, when the time period expired to file a petition for writ of *certiorari* to the United States Supreme Court. *See Meredith v. Chandler*, 2007 WL 1231556 (W.D. Ky. April 23, 2007), citing *Bronaugh v. Ohio*, 235 F.3d 280, 283-84 (6th Cir. 2000). However, at that time, petitioner had pending in the state courts a petition for post conviction relief, which tolled the running of the statute of limitations until August 10, 2005, when the Ohio Supreme Court dismissed the post conviction petition. *See Lawrence v. Florida*, – U.S. –, 127 S.Ct. 1079, 1082-83 (2007)(statute of limitations is not tolled during the pendency of a petition for *certiorari* from denial of state post conviction petition). The statute of limitations therefore expired one year later, on August 10, 2006. Petitioner's December 29, 2004, delayed application to reopen the appeal pursuant to Ohio Appellate Rule 26(B), which remained pending until August 10, 2005, did not toll the running of the statute of limitations under 2244(d)(2), because the state courts denied the Rule 26(B) application as untimely. *See Gorman v. Brunsman,* 2006 WL 1645066 (S.D. Ohio June 7, 2006), citing *Artuz v. Bennett,* 531 U.S. 4, 8 (2000); *Vroman v. Brigano,* 346 F.3d 598, 603 (6th Cir. 2003); *Israfil v. Russell,* 276 F.3d 768, 771-

18

72 (6th Cir. 2001); *Pace v. DiGuglielmo,* 544 U.S. 408, 125 S.Ct. 1807 (2005). The instant petition,

filed on December 28, 2005, is therefore timely. However, petitioner's November 6, 2006, motion

to amend the petition to add a new claim, filed almost one year later, is not.

In *Mayle v. Felix*, 545 U.S. 644 (2005), the United States Supreme Court addressed whether

an untimely request to amend a habeas corpus petition with new claim(s) relates back to timely

raised claims under Rule 15 of the Federal Rules of Civil Procedure.[3] The Supreme Court held:

> An amended habeas petition... does not relate back (and thereby
> escape AEDPA's one-year time limit) when it asserts a new ground
> for relief supported by facts that differ in both time and type from
> those the original pleading set forth.

---

[3] Rule 15 of the Federal Rules of Civil Procedure provides in relevant part:

(a) Amendments. A party may amend the party's pleading once as
a matter of course at any time before a responsive pleading is
served or, if the pleading is one to which no responsive pleading is
permitted and the action has not been placed upon the trial
calendar, the party may so amend it at any time within 20 days
after it is served. Otherwise a party may amend the party's pleading
only by leave of court or by written consent of the adverse party;
and leave shall be freely given when justice so requires.

\*\*\*

(c) Relation Back of Amendments. An amendment of a pleading
relates back to the date of the original pleading when

(1) relation back is permitted by the law that provides the statute of
limitations applicable to the action, or

(2) the claim or defense asserted in the amended pleading arose out
of the conduct, transaction, or occurrence set forth or attempted to
be set forth in the original pleading....

*Id*. at 645.  The Supreme Court reasoned:

> The Civil Rule governing pleading amendments, Federal Rule of Civil Procedure 15, made applicable to habeas proceedings by § 2242, Federal Rule of Civil Procedure 81(a)(2), and Habeas Corpus Rule 11, allows pleading amendments with "leave of court" any time during a proceeding. See Fed. Rule Civ. Proc. 15(a). Before a responsive pleading is served, pleadings may be amended once as a "matter of course," *i.e.*, without seeking court leave. *Ibid.* Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings "ar[i]se out of the conduct, transaction, or occurrence." Rule 15(c)(2).

> The "original pleading" to which Rule 15 refers is the complaint in an ordinary civil case, and the petition in a habeas proceeding. Under Rule 8(a), applicable to ordinary civil proceedings, a complaint need only provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Habeas Corpus Rule 2(c) is more demanding. It provides that the petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." *See also Advisory Committee's Note* on subd. (c) of Habeas Corpus Rule 2, 28 U.S.C., p. 469 ("In the past, petitions have frequently contained mere conclusions of law, unsupported by any facts. [But] it is the relationship of the facts to the claim asserted that is important ... ."); *Advisory Committee's Note* on Habeas Corpus Rule 4, 28 U.S.C., p. 471 (" '[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error." (internal quotation marks omitted)). Accordingly, the model form available to aid prisoners in filing their habeas petitions instructs in boldface:

> **"CAUTION: You must include in this petition all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date."** Petition for Relief From a Conviction or Sentence By a Person in State Custody, Habeas Corpus Rules, Forms App. (emphasis in original).

A prime purpose of Rule 2(c)'s demand that habeas petitioners plead with particularity is to assist the district court in determining whether the State should be ordered to "show cause why the writ should not be granted." § 2243. Under Habeas Corpus Rule 4, if "it plainly appears from the petition ... that the petitioner is not entitled to relief in district court," the court must summarily dismiss the petition without ordering a responsive pleading. If the court orders the State to file an answer, that pleading must "address the allegations in the petition." Rule 5.

*Id.* at 654-56.

Congress enacted AEDPA to advance the finality of criminal convictions. *See Rhines v. Weber*, 544 U.S. ----, ----, 125 S.Ct. 1528, 1534, 161 L.Ed.2d 440 (2005). To that end, it adopted a tight time line, a one-year limitation period ordinarily running from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," 28 U.S.C. § 2244(d)(1)(A). If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.... The very purpose of Rule 15(c)(2), as the dissent notes, is to "qualify a statute of limitations." *Post*, at ----2. But "qualify" does not mean repeal. *See Fuller v. Marx*, 724 F.2d 717, 720 (C.A.8 1984). Given AEDPA's "finality" and "federalism" concerns, *see Williams v. Taylor*, 529 U.S. 420, 436, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); *Hicks*, 283 F.3d, at 389, it would be anomalous to allow relation back under Rule 15(c)(2) based on a broader reading of the words "conduct, transaction, or occurrence" in federal habeas proceedings than in ordinary civil litigation, *see supra,* at 2570-2572.

***

... So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order.... Our reading is consistent with the general application of Rule 15(c)(2) in civil cases... with Habeas Corpus Rule 2(c)... and with AEDPA's installation of a tight time line for § 2254 petitions....

*Id.* at 662-64 (citations and footnotes omitted.)

Here, petitioner seeks to amend the petition to assert a claim that he was denied a fair trial and the right to present a defense because he was "denied the opportunity to present evidence regarding the increased risk of suicidality among young adults... who take Paxil and evidence regarding the severe withdrawal symptoms that many people suffer, and that Claire Schneider did suffer, when suddenly discontinuing the use of Paxil." *See Motion to Amend and Stay.* Arguably, this claim is tied to the same "common core of operative" facts as petitioner's timely claim of ineffective assistance of counsel due to his attorneys' failure

> to procure and present additional evidence and argument concerning Paxil, Paxil Withdrawal Syndrome, Claire Schneider's medical and psychological history, and the relationship of these matters to Claire Schneider's death.

*Petition*, claim nine. Further, the Court notes that, according to petitioner, his amended claim arises from new evidence that was not available until Spring 2006. *See Motion to Amend and Request for Stay; Reply to Respondent's Response.* Arguably, therefore, petitioner's amended claim may be timely under 28 U.S.C. §2244(d)(1)(D). For these reasons, petitioner's request to amend the petition is **GRANTED.** However, a stay of proceedings pending exhaustion of this additional claim is not appropriate under *Rhines v. Weber*, *supra.*

Petitioner acknowledges that his amended claim is unexhausted. *See Motion to Amend and Stay.* Before a federal habeas court may grant relief, a state prisoner must exhaust his available remedies in the state courts. *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993). If a habeas petitioner has the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. §2254(b), (c). Moreover, a

22

constitutional claim for relief must be presented to the state's highest court in order to satisfy the exhaustion requirement. *O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999); *Manning v. Alexander,* 912 F.2d 878, 881 (6th Cir. 1990). Where alternative state remedies are available to consider the same claim, however, exhaustion of one of these remedies is all that is necessary. A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he seeks to present for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987).

As discussed above, because the statute of limitations has now expired, a dismissal of this case in its entirety will bar petitioner from re-filing his federal habeas corpus petition. In *Rhines v. Weber*, *supra*, 544 U.S. at 269, the Supreme Court recognized the district court's authority to stay proceedings in such a scenario under limited circumstances:

> Stay and abeyance, if employed too frequently, has the potential to undermine these twin purposes. Staying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings. It also undermines AEDPA's goal of streamlining federal habeas proceedings by decreasing a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition. *Cf. Duncan, supra,* at 180, 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 ("[D]iminution of statutory incentives to proceed first in state court would ⋯ increase the risk of the very piecemeal litigation that the exhaustion requirement is designed to reduce").

> For these reasons, stay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. Cf. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas

23

corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

Even where stay and abeyance is appropriate, the district court's discretion in structuring the stay is limited by the timeliness concerns reflected in AEDPA. A mixed petition should not be stayed indefinitely. Though, generally, a prisoner's "principal interest ⋯ is in obtaining speedy federal relief on his claims," *Lundy, supra,* at 520, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (plurality opinion), not all petitioners have an incentive to obtain federal relief as quickly as possible. In particular, capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death. Without time limits, petitioners could frustrate AEDPA's goal of finality by dragging out indefinitely their federal habeas review. Thus, district courts should place reasonable time limits on a petitioner's trip to state court and back. *See, e.g., Zarvela,* 254 F.3d, at 381 ("[District courts] should explicitly condition the stay on the prisoner's pursuing state court remedies within a brief interval, normally 30 days, after the stay is entered and returning to federal court within a similarly brief interval, normally 30 days after state court exhaustion is completed"). And if a petitioner engages in abusive litigation tactics or intentional delay, the district court should not grant him a stay at all. *See id.,* at 380-381.

On the other hand, it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics. In such circumstances, the district court should stay, rather than dismiss, the mixed petition. *See Lundy,* 455 U.S., at 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (the total exhaustion requirement was not intended to "unreasonably impair the prisoner's right to relief"). In such a case, the petitioner's interest in obtaining federal review of his claims outweighs the competing interests in finality and speedy resolution of federal petitions.  For the same reason, if a petitioner presents a district court with a mixed petition and the court determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief. See *id.,* at 520, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (plurality opinion) ("[A petitioner] can always amend the petition to delete the unexhausted

24

claims, rather than returning to state court to exhaust all of his claims").

*Rhines v. Weber*, *supra*, 544 U.S. at 277-278.  In *Pace v. DiGuglielmo,* 544 U.S. 408 (2005), the

Supreme Court noted that:

> [a] petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute "good cause" for him to file in federal court.

As of yet, there is little guidance as to what constitutes good cause for failing to exhaust state

court remedies.

> Various courts have adopted the standard for cause applicable to procedural defaults which requires that some "objective factor external to the defense" made it impossible to bring the claim earlier in the state court proceedings as required by *Coleman v. Thompson,* 501 U.S. 722, 755, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). *See e.g., Fernandez v. Artuz* 2006 WL 121943, *5 (S.D.N.Y., January 18, 2006); *Pierce v. Hurley,* 2006 WL 143717, *8 (S.D.Ohio, January 18, 2006); *Carter v. Friel,* 2006 WL 208872, *3 (D.Utah, January 6, 2006); *Hernandez v. Sullivan,* 397 F.Supp.2d 1205, 1207 (C.D.Cal., 2005). Others, such as *Jackson v. Roe,* 425 F.3d 654 (9th Cir.2005), and the remanded *Rhines v. Weber,* 2005 WL 3466015, *2-3 (D.S.D., December 19, 2005), conclude that the cause standard of *Rhines* requires a lesser showing than that for procedural default.

> In *Jackson v. Roe,* the Ninth Circuit Court of Appeals concluded that good cause did not require a showing of "extraordinary circumstances." The Court said

> > [W]e hold that the application of an "extraordinary circumstances" standard does not comport with the "good cause" standard prescribed by *Rhines. See NLRB v. Zeno Table Co.,* 610 F.2d 567, 569 (9th Cir.1979) (distinguishing between the "good cause" standard found in NLRB regulations and the "extraordinary circumstances" standard in section 10(e) of the National Labor Relations Act and noting that " 'good cause' ⋯ appears to be less stringent than ⋯ 'extraordinary circumstances' ').

*Jackson,* 425 F.3d at 661-62.

25

Thus, it would appear that good cause under *Rhines,* at least in [the Ninth] Circuit, should not be so strict a standard as to require a showing of some extreme and unusual event beyond the control of the defendant. This is supported by the Supreme Court's observation in *Pace v. DiGuglielmo,* 544 U.S. 408, ----, 125 S.Ct. 1807, 1813-14, 161 L.Ed.2d 669 (2005), wherein the Court declared that a petitioner's confusion over whether or not his petition would be timely filed was "good cause" for the petitioner to file his unexhausted petition in the federal court.

Another court to discuss the standard of good cause under *Rhines* was the Eastern District of Pennsylvania. That court concluded that the good cause standard falls somewhere between the "lower threshold of unfairness," and the "higher standard of extraordinary circumstances, necessary for equitable tolling in capital cases." *See Baker v. Horn,* 383 F.Supp.2d 720, 747 (E.D.Pa. 2005). This discussion of *Rhines,* while in the context of equitable tolling of a federal challenge in a capital case, examined whether the court should previously have granted a stay of the petition considering the petitioner's particular circumstances and the shifting state of the law in Pennsylvania at the time the original petitioner was filed.

The federal district courts have also developed a split of authority on whether ineffective assistance of post-conviction counsel qualifies as good cause to permit a stay of the federal proceedings. At least five district courts found that alleged ineffective assistance of counsel during post-conviction proceedings did constitute good cause for failure to exhaust claims in state proceedings, most without much discussion of the matter. *See e.g., Rhines v. Weber,* 2005 WL 3466015, *2-3 (D.S.D., December 19, 2005); *Ramchair v. Conway,* 2005 WL 2786975 at *16 (E.D.N.Y., October 26, 2005); *Boyd v. Jones,* 2005 WL 2656639 at *4 (E.D.Mich., October 14, 2005); *Fradiue v. Pliler,* 2005 WL 2204862 at *2 (E.D.Cal., September 8, 2005); and *Martin v. Warren,* 2005 WL 2173365 at *2 (E.D.Mich., September 2, 2005). Similarly at least three district courts found that alleged ineffective assistance of counsel during post-conviction proceedings did not constitute good cause. *See, e.g., Carter v. Friel,* 2006 WL 208872, *3 (D.Utah, January 6, 2006); *Vasquez v. Parrott,* 397 F.Supp.2d 452, 464 (S.D.N.Y., 2005); *Hubbert v. Renico,* 2005 WL 2173612 at *3 (E.D.Mich., September 7, 2005).

Thus, the split of authority is broad and varied. However, the discussions by the Pennsylvania court in *Baker* and the Ninth Circuit in *Jackson* support ... [the] conclusion that the good cause standard applicable in consideration of a request for stay and abeyance of a federal habeas petition requires the petitioner to show that he was prevented from raising the claim, either by his own ignorance or confusion about the law or the status of his case, or by circumstances over which he had little or no control, such as the actions of

> counsel either in contravention of the petitioner's clearly expressed desire to
> raise the claim or when petitioner had no knowledge of the claim's existence.

*Riner v. Crawford*, 415 F.Supp.2d 1207, 1209-11 (D.Nevada 2006).

Petitioner contends that there exists good cause for his failure to exhaust state court remedies in that the factual basis for his amended claim was not available until April and May 2006. *Request to Amend and Stay,* at 6. Petitioner further asserts that he has now located an expert witness who has provided an opinion that "will support an arguably meritorious motion for new trial in the Ohio trial court." *Id.*

Notwithstanding petitioner's arguments, the record does not reflect good cause for petitioner's failure to exhaust state court remedies. To date, petitioner has failed to pursue any state court action regarding his new claim.[4] Additionally, under Ohio Criminal Rule 33(B), a motion for new trial at this time will likely be barred by the state courts as untimely.

> Application for a new trial shall be made by motion which, except for
> the cause of newly discovered evidence, shall be filed within fourteen
> days after the verdict was rendered, or the decision of the court where
> a trial by jury has been waived, unless it is made to appear by clear
> and convincing proof that the defendant was unavoidably prevented
> from filing his motion for a new trial, in which case the motion shall
> be filed within seven days from the order of the court finding that the
> defendant was unavoidably prevented from filing such motion within
> the time provided herein.

> Motions for new trial on account of newly discovered evidence shall
> be filed within one hundred twenty days after the day upon which the
> verdict was rendered, or the decision of the court where trial by jury
> has been waived. If it is made to appear by clear and convincing
> proof that the defendant was unavoidably prevented from the

---

[4] Petitioner suggests that he intends to "proceed with a motion for a new trial and perhaps additional relief." *Motion for Leave to Amend and to Stay and Abey,* at p. 3, Doc. No. 19.

> discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Ohio Criminal Rule 33(B). It does not appear that petitioner will be able to meet these time requirements here. In *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir.2005), the United States Court of Appeals for the Fifth Circuit held that claims are "plainly meritless" for purposes of deciding whether to grant a stay of habeas corpus proceedings where the petitioner is procedurally barred from raising his unexhausted claims in the state courts. Finally, the record fails to indicate that petitioner's unexhausted claim is potentially meritorious. *Rhines v. Weber, supra*.

For the foregoing reasons, petitioner's request to amend the petition is **GRANTED**; however, petitioner's request for a stay of proceedings is **DENIED**. The Magistrate Judge **RECOMMENDS** that this action be **DISMISSED** without prejudice as unexhausted. Alternatively, petitioner may notify the Court within ten (10) days if he wishes to delete his unexhausted claim and proceed on his remaining exhausted claims.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation*

28

will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


July 19, 2007                                        *s/Norah McCann King*
                                                       Norah McCann King
                                                United States Magistrate Judge